**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION**

| | | |
|---|---|---|
| MEGAN ELLYIA GREEN | ) | |
| | ) | |
|     Plaintiff, | ) | |
| | ) | |
| v. | ) | Cause No. 4:18-cv-01629 |
| | ) | |
| CITY OF SAINT LOUIS, MISSOURI, | ) | |
| and JOHN DOEs 1-5 in their individual | ) | JURY TRIAL DEMANDED |
| and official capacities. | ) | |
| | ) | |
| | ) | |
|     Defendants. | ) | |

## COMPLAINT

On September 15, 2017, hundreds of citizens converged in the Central West End neighborhood of St. Louis to peacefully exercise their Constitutional right to protest. At approximately 9:30 PM, Megan Ellyia Green ("Ms. Green"), a duly elected Alderman for the City of St. Louis, encountered a mass of St. Louis police officers indiscriminately firing tear gas at peaceful protestors. Ms. Green took refuge in a synagogue where she experienced the terror of officers pounding on the doors and threatening the occupants. After 1.5 hours, she was able to safely leave the synagogue and attempt to get to her car to leave the area. As she attempted to leave, an armored police vehicle did a drive-by, firing tear gas canisters at random people on the street. Ms. Green has witnessed St. Louis police use this drive-by tactic before, in 2014 during the Michael Brown protests, which was the basis for St. Louis police entering into a Consent Decree promising not to do the exact actions that injured Ms. Green four years later. **Ms. Green shall donate any money she may receive to the 25-Year Managed Racial Equity Fund that the**

Ferguson Commission recommended as an action item for the City of St. Louis, and which, to date, the City has failed to pursue.

## JURISDICTION AND VENUE

1.      Plaintiff brings this claim pursuant to 42 U.S.C. § 1983, the Fourteenth Amendment to the United States Constitution, and the First and Fourth Amendments, as incorporated as against States and their municipal divisions through the Fourteenth Amendment.

2.      The jurisdiction of this Court is proper, pursuant to 28 U.S.C. § 1331, because Plaintiff's action arises under the Constitution of the United States and § 1343(a)(3) to redress the deprivation of rights secured by the Constitution of the United States.

3.      Venue is proper in the United States District Court for the Eastern District of Missouri, pursuant to 28 U.S.C. § 1391(b)(2), because a substantial part of the events giving rise to the claims occurred in the City of St. Louis.

4.      Divisional venue is proper in the Eastern Division because a substantial part of the events leading to the claims for relief arose in the City of St. Louis and Defendants reside in the Eastern Division. E.D. Mo. L.R. 2.07(A)(1), (B)(1).

5.      This Court has supplemental jurisdiction over the included Missouri state law claims, pursuant to 28 U.S.C. §1367.

6.      Plaintiff demands a trial by jury, pursuant to Fed. R. Civ. P. 38(b).

## PARTIES

7.      Defendant the City of St. Louis, Missouri (hereinafter, "City of St. Louis") is a first-class city, and a political subdivision of the State of Missouri duly organized under the Constitution of Missouri.

8.      The St. Louis Metropolitan Police Department ("SLMPD") is an instrumentality of the City of St. Louis, Missouri organized and controlled pursuant to the Statutes of the State of Missouri.

9.      The Public Facilities Protection Corporation of the City of St. Louis insures the SLMPD.

10.     John Does 1-5 are, as of yet, unidentified police officers with the St. Louis Metropolitan Police Department. The Defendants unlawfully used chemical munitions against Plaintiff. Plaintiff has been unable to identify this officer because the officers were hidden inside a police vehicle when they tear gassed Plaintiff.

11.     Plaintiff is resident of the City of St. Louis and an elected Alderman.

## FACTS

### A.     Backdrop of Stockley Verdict

12.     On Friday, September 15, 2017, after a four-day bench trial, a Missouri Circuit Court Judge acquitted Officer Jason Stockley of the first-degree murder of Anthony Lamar Smith. *See* Exh. A, Stockley Verdict.

13.     This acquittal shocked many in the St. Louis community, as an audio recording submitted into evidence in the trial captured Officer Stockley saying, "we're killing this motherfucker, don't you know" in reference to Mr. Smith. *Id*. at 5.

14.      Further, evidence showed that during the incident Officer Stockley was in possession of an assault rifle that had not been issued to him by the SLMPD. *Id*. at 23.

15.     In addition, Officer Stockley claimed to find a gun in Mr. Smith's car after he killed Mr. Smith. *Id*. at 25.

16.     Only Officer Stockley's DNA was found on the gun, leading many, including the Circuit Attorney of the City of St. Louis, to believe that Stockley planted the gun on Mr. Smith after Mr. Smith's death, in an effort to justify the killing. *Id*. at 12.

17.     At trial, Officer Stockley's partner did not testify in Stockley's defense. Rather, the partner invoked his Fifth Amendment right against self-incrimination.[1]

### B.     Protests Begin After the Verdict

18.     Following the announcement of the Stockley Verdict, public protests began at multiple locations in St. Louis and surrounding communities.

19.     To many in the St. Louis community, Officer Stockley's acquittal was yet another example of white St. Louis-area police officers killing African-American citizens with impunity.

20.     Further, in the view of the protestors, the acquittal further supported their view that the American criminal justice system does not believe that Black lives matter.

21.     In response to the protests, St. Louis Metropolitan police officers amassed at several protests wearing military-like tactical dress, helmets, batons, and full-body riot shields and carrying chemicals, such as tear gas, skunk, inert smoke, pepper gas, pepper pellets, xylyl bromide, and/or similar substances (collectively, "chemical agents").

22.     This is in stark contrast to SLMPD's appearance at a multitude of other un-permitted protests where the police themselves are not the target of the protest, including an anti-Donald Trump march on November 13, 2016, the St. Louis Women's March on January 21, 2017,

---

[1] *See* Joel Currier, *Partner of Ex-St. Louis Cop Charged with Murder is Given Immunity, Ordered to Testify*, St. Louis Post-Dispatch, Jul 27, 2016, available at http://www.stltoday.com/news/local/crime-and-courts/partner-of-ex-st-louis-cop-charged-with-murder-is/article_b85140b8-3744-55fb-83ee-3d9474cc70b3.html.

the St. Louis LGBTQIA March and Rally on February 22, 2017, and the St. Louis March for Science on April 22, 2017.

23.    Virtually all of the protests were non-violent.

24.    On three occasions, a handful of protesters committed minor property damage, including broken windows and broken flower pots.

25.    During the Stockley protests, SLMPD police officers deployed chemical agents, *without warning*, against individuals observing, recording, or participating in protest activity, including but not limited to the following:

    a.    The afternoon of Friday, September 15, 2017, near the intersection of Clark and Tucker Avenues.

    b.    The evening of Friday, September 15, 2017, near the intersection of McPherson and Euclid Avenues.

    c.    The evening of Friday, September 15, 2017, near the intersection of Waterman and Kingshighway Boulevards.

    d.    The evening of Friday, September 15, 2017, near the intersection of Lindell and Euclid Avenues.

    e.    The evening of Friday, September 15, 2017, near the intersection of Euclid and Maryland Avenues.

    f.    The evening of Friday, September 15, 2017, near the intersection of Lindell and Kingshighway Boulevards.

    g.    The evening of Friday, September 15, 2017, near the intersection of Euclid Avenue and Pershing Place.

    h.    The evening of Friday, September 15, 2017, on Hortense Place.

i.      The evening of Sunday, September 17, 2017, near the intersection of Tucker Boulevard and Washington Avenue.

j.      The evening of September 29, 2017 outside of Busch Stadium.

26.     These incidents are consistent with the pattern and practice of SLMPD of indiscriminately using chemical agents without warning.

### C.      Post-Ferguson Federal Court Proceedings

27.     On December 11, 2014, a federal judge in this District issued a temporary restraining order enjoining the SLMPD from enforcing any rule, policy, or practice that grants law enforcement officials the authority or discretion to:

(1)     utilize tear gas, inert smoke, pepper gas, or other chemical agents (collectively, "chemical agents") for the purpose of dispersing groups of individuals who are engaged in peaceful, non-criminal activity in the City of St. Louis or in the County of St. Louis

        (a)      without first issuing clear and unambiguous warnings that such chemical agents will be utilized;
        (b)      without providing the individuals sufficient opportunity to heed the warnings and exit the area;
        (c)      without minimizing the impact of such chemical agents on individuals who are complying with lawful law enforcement commands; and
        (d)      without ensuring that there is a means of safe egress from the area that is available to the individuals; and

(2)     utilize chemical agents on individuals engaged in peaceful, non-criminal activity in the City of St. Louis or in the County of St. Louis for the purpose of frightening them or punishing them for exercising their constitutional rights.

*See* Exh. B, Temporary Restraining Order in *Templeton v. Dotson*, No. 4:14-cv-02019 (E.D. Mo. Dec. 11, 2014) at 3.

28.     This suit was in response to SLMPD firing chemical agents into a business where peaceful protestors had congregated, without allowing the protestors to leave.

6

29.     The City entered into a settlement agreement on March 25, 2015, where it agreed

as follows:

A.     Defendants and their agents, servants, employees, and representatives, will
not enforce any rule, policy, or practice that grants law enforcement officials the authority
or discretion to:
         (1)     utilize tear gas, inert smoke, pepper gas, or other chemical agents
         (collectively, "chemical agents") for the purpose of dispersing groups of
         individuals who are engaged in non-criminal activity:

                 (a)     without first issuing clear and unambiguous warnings that
         such chemical agents will be utilized;
                 (b)     without providing the individuals sufficient opportunity to
         heed the warnings and exit the area;
                 (c)     without reasonably attempting to minimize the impact of
         such chemical agents on individuals who are complying with lawful law
         enforcement commands; and
                 (d)     without ensuring that there is a means of safe egress from the
         area that is available to the individuals and announcing this means of egress
         to the group of individuals.

         (2)     utilize chemical agents on individuals engaged in non-criminal
         activity for the purpose of frightening them or punishing them for exercising their
         constitutional rights.

B.     Provided, however, that Paragraph A hereof shall not be applicable to
situations that turn violent and persons at the scene present an imminent threat of bodily
harm to persons or damage to property, and when law enforcement officials must defend
themselves or other persons or property against such imminent threat.

*See* Exh. C, Settlement Agreement in *Templeton v. Dotson*, No. 4:14-cv-02019 (E.D. Mo. Mar.

25, 2015) at 1-2.

### D.  SLMPD Violations of the Consent Decree

30.     Less than two months after entering into this Consent Decree, SLMPD began to

violate the Decree.

31.     On May 19, 2015, in response to protests over the St. Louis Circuit Attorney's

office's refusal to charge another SLMPD officer for killing another African-American man,

SLMPD officers deployed chemical agents against peaceful, non-criminal protestors without

7

warning. *See* Exh. D, Transcript of Testimony, Volume 1, *Ahmad v. St. Louis*, No. 4:17-cv-02455 (E.D. Mo. Oct. 18, 2017) at 69.

32.     On August 19, 2015, a protest occurred because SLMPD officers killed another African-American man in the Fountain Park neighborhood. According to the testimony of Sarah Molina, a local attorney, SLMPD officers indiscriminately used chemical agents without giving an audible and intelligible warning at the intersection of Walton Avenue and Page Boulevard. *Id*. at 50-52. Molina testified that SLMPD officers fired chemical agents at her without giving her an opportunity to leave. *Id.* SLMPD officers continued using chemical agents against people fleeing the area and even fired chemical agents at people peacefully standing on or in their own properties. *Id.* Thirty minutes after the protests had dissipated, SLMPD officers returned and fired chemical agents at Ms. Molina, who was standing on property that she owns. *Id.*

33.     On July 21, 2017, SLMPD officers used chemical agents against people protesting the treatment of detainees in the St. Louis City Workhouse. *Id.* at 71, 91. Although a few people did engage in unlawful activity earlier in the night, SLMPD officers pepper sprayed numerous people, none of whom were involved in criminal activity or were even at the same location as the criminal activity. These protesters were engaged in non-violent protesting when SLMPD officers sprayed them with chemical agents. *Id.*

### E.     The September 15, 2017 Protest

34.     This pattern and practice of utilizing chemical agents on individuals engaged in peaceful, non-criminal activity continued on September 15, 2017.

35.     On September 15, 2017 at around 7:00 PM, Ms. Green went to the Central West End neighborhood of St. Louis to join a group of nearly 1,000 citizens to protest the Stockley acquittal.

36.     Ms. Green has been active in protests in support of the Black Lives Matter movement since 2014.

37.     Upon arriving, Ms. Green participated in the march that started in the Central West End. After the march, she traveled south on Lake Avenue and saw buses of riot police officers coming in from both directions. The SLMPD officers blocked the whole intersection at Waterman Boulevard and Lake Avenue.

38.     In every direction Ms. Green looked, she saw SLMPD officers in riot gear. The officers did not allow Ms. Green or other citizens any viable means to egress and disperse from the area.

39.     Ms. Green then encountered police near the intersection of Lake and Waterman stretching to Kingshighway near Central Reform Congregation ("the Synagogue").

40.     Ms. Green entered the Synagogue around 9:30 PM and 10:00 PM to avoid tear gassed that SLMPD was indiscriminately firing.

41.     Approximately 100 to 150 people entered the Synagogue with Ms. Green seeking refuge.

42.     While inside, Ms. Green could hear SLMPD officers banging on the door and yelling. She could also see clouds of tear gas and that the Synagogue entrance was surrounded by SLMPD officers.

43.     Ms. Green and the others stayed inside the Central Reform Congregation for at least an hour because SLMP officers had surrounded the Synagogue. The people inside felt threatened by the police who were lying in wait.

44.     The symbolism of citizens seeking refuge in a synagogue while out of control government actors pursued them was not lost on Ms. Green.

45.     When the SLMPD officers that had been surrounding the Synagogue dispersed, Ms. Green and approximately ten other protesters exited the Synagogue. Ms. Green had decided to head home because the protests were done, because she did not feel safe due to aggressive action of the SLMPD, and because the SLMPD had made it known that they did not want protestors in the area. She and the others attempted to reach their vehicles and go home.

46.     Ms. Green and others walked south on Kingshighway. As they neared the Chase Park Plaza, a line of SLMPD officers approached.

47.     Ms. Green peacefully approached the police and asked for permission for her and the others to cross the police line in order to reach their vehicle located at Euclid and Laclede.

48.     The police granted Ms. Green and others permission to cross the police line.

49.     As Ms. Green and the others crossed the police line to return to their vehicles, several SLMPD officers began to make mocking statements toward Ms. Green.

50.     After crossing the police line, Ms. Green turned left onto Lindell Boulevard.

51.     Before reaching her nearby parked vehicle, Ms. Green saw an armored SLMPD truck ("MRAP") speed around the corner from Euclid onto Lindell, where Ms. Green and others were walking.

52.     Having seen a similar SLMPD MRAP indiscriminately fire tear gas in 2014 (the incident that predicated the *Templeton* lawsuit described below), Ms. Green yelled to the other innocent people near her to take cover.

53.     Ms. Green and others tried to take cover near the theater on Lindell.

54.     The MRAP passed Ms. Green once without incident and then stopped at the corner of Lindell and Kingshighway.

55.     Ms. Green and others quickly crossed Lindell to get closer to their vehicles and get to safety.

56.     After Ms. Green crossed Lindell, the MRAP made a U-turn and returned to Ms. Green's location. The SLMPD MRAP then began to indiscriminately disperse tear gas.

57.     Ms. Green heard no warning from the MRAP that tear gas was being deployed.

58.     Ms. Green was not committing a crime at the time tear gas was deployed.

59.     Ms. Green did not see any crimes committed nor any threat to an officer's safety at the time tear gas was deployed.

60.     The tear gas worked as intended as Ms. Green began to feel excruciating pain. Her eyes began to burn. Mucus ran from her nose. Her breathing became labored. These reactions persisted for several months.

61.     Two weeks later, in response to the deployment of chemical munitions against another set of peaceful protestors, SLMPD released a statement that read in part, "Officers deploy tactics when criminal activity arises and escalation depends on the level of aggression. […] Pepper spray is a non-lethal tool used when unlawful behavior occurs to protect life and property."[2]

62.     This statement contradicts the SLMPD's use of chemical munitions against Plaintiff. Plaintiff was not engaged in any unlawful behavior that required chemical munitions. No life or property was in danger when SLMPD tear gassed Plaintiff.

63.     Ms. Green's experience on September 15, 2017 made her fear future police retaliation for exerting her First Amendment rights of speech and assembly.

---

[2] *See* Erin Heffernan, *St. Louis Faith Leaders Criticize Arrest, Pepper-Spraying of Clergyman at Protest*, St. Louis Post-Dispatch, Oct 3, 2017, available at
https://www.stltoday.com/news/local/metro/st-louis-faith-leaders-criticize-arrest-pepper-spraying-of-clergyman/article_f065d923-634d-526a-8b0f-45dc443ec1cb.html.

64.     She is frightened of arbitrary arrest by the St. Louis Metropolitan police, as well as abuse and retaliation for engaging in expressive activity that is critical of the police.

65.     For approximately six months, Plaintiff suffered from respiratory issues as a result of the illegal tear gassing.

### F.      Federal Court Injunctive Relief

66.     On November 15, 2017, a judge in this District barred SLMPD from using many of the tactics described in this complaint. *See* Exh. E, Memorandum and Order of Preliminary Injunction, *Ahmad v. St. Louis*, No. 4:17-cv-02455 (E.D. Mo. Nov. 15, 2017).

67.     The Court found that "[p]rotest activity began shortly after the announcement of the verdict on the morning of September 15, 2017. Protesters assembled in front of the state courthouse downtown near Tucker and Market streets. They did not have a permit to protest because the City of St. Louis does not require, and will not provide, a permit for protests." *Id.* at 2.

68.     In an attempt to defend the SLMPD's actions, the City's attorney "stated during closing arguments that 'the police have the right to tell people, at this point, we're done for the evening; there's no – no more assembling; this assembly is over.'" *Id.* at 37. Not surprisingly, the Court did not adopt this rationale as a basis for the arrests and the use of chemical agents.

69.     The Court made the following findings:

        a.      Plaintiffs are likely to prevail on the merits of their claims that the policies or customs of defendant discussed below violate the constitutional rights of plaintiffs. *Id.* at 35-36.

        b.      Plaintiffs have presented sufficient evidence demonstrating that they are likely to prevail on their claim that defendant's custom or policy is to permit any officer to

declare an unlawful assembly in the absence of the force or violence requirement of St. Louis City Ordinance 17.16.275 and Mo. Rev. Stat. § 574.060, in violation of plaintiffs' First and Fourth Amendment rights. *Id*. at 36.

      c.    Plaintiffs have presented sufficient evidence for purposes of awarding preliminary injunctive relief that defendant's custom or policy of committing discretionary authority to police officers to declare unlawful assemblies in the absence of any threat of force or violent activity provides no notice to citizens of what conduct is unlawful, and it permits officers to arbitrarily declare "there's no more assembling." *Id*. at 37-38. Plaintiffs have presented sufficient evidence at this stage of the proceedings that this discretion was in fact exercised in such a manner in violation of plaintiffs' constitutional rights. *Id*.

      d.    Similarly, Plaintiffs have presented sufficient evidence demonstrating that they are likely to prevail on their claim that defendant's custom or policy is to permit officers to issue vague dispersal orders to protesters exercising their first amendment rights in an arbitrary and retaliatory way and then to enforce those dispersal orders without sufficient notice and opportunity to comply before being subjected to uses of force or arrest, in violation of Plaintiffs' First and Fourth Amendment rights. *Id*. at 39.

      e.    Plaintiffs presented sufficient, credible evidence for purposes of awarding preliminary injunctive relief that defendant has a custom or policy, in the absence of exigent circumstances, of issuing dispersal orders to citizens engaged in expressive activity critical of police which are either too remote in time and/or too vaguely worded to provide citizens with sufficient notice and a reasonable opportunity to comply, inaudible and/or not repeated with sufficient frequency and/or by a sufficient number of officers to provide

citizens with sufficient notice and a reasonable opportunity to comply, contradictory and inconsistent, not uniformly enforced, and retaliatory. *Id*. at 40.

 f. Plaintiffs have also presented sufficient evidence demonstrating that they are likely to prevail on their claim that defendant has a custom or policy of using chemical agents without warning on citizens engaged in expressive activity that is critical of police or who are recording police in retaliation for the exercise of their first amendment rights, in violation of the First, Fourth, and Fourteenth Amendments. *Id*. at 41.

 g. The City's custom or policy of authorizing the use of hand-held mace against non-violent protesters with no warning or opportunity to comply and in the absence of probable cause or exigent circumstances impermissibly circumvents the protections afforded by the *Templeton* settlement agreement and vests individual officers with unfettered discretion to exercise that authority in an arbitrary and retaliatory manner in violation of constitutional rights. *Id*. at 43-44.

 h. Plaintiffs' evidence — both video and testimony — shows that officers have exercised their discretion in an arbitrary and retaliatory fashion to punish protesters for voicing criticism of police or recording police conduct. When all of the evidence is considered, plaintiffs have met their burden of showing that they are likely to succeed on their claim that defendant has a custom or policy of deploying hand held pepper spray against citizens engaged in recording police or in expressive activity critical of police in retaliation for the exercise of their first amendment rights, in violation of the First, Fourth, and Fourteenth Amendments. *Id*. 44.

 i. Plaintiffs have also presented sufficient evidence at this preliminary stage of the proceedings that the aforementioned customs or policies of defendant caused the

violations of plaintiff's constitutional rights. *Id*. 44. That is because "it is well-settled law that a loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury" and "it is always in the public interest to protect constitutional rights." *Phelps-Roper v. Nixon*, 545 F.3d 685, 691 (8th Cir. 2008) (internal quotation marks and citations omitted), overruled on other grounds, *Phelps-Roper v. City of Manchester, Mo.*, 697 F.3d 678 (2012). *Id*. 44-45.

70. Upon information and belief, senior officials of the SLMPD, including Defendant Boyher were directing such actions and conduct and/or tacitly accepting and encouraging such conduct by not preventing officers from engaging in such conduct and by not disciplining them when they did engage in such actions and conduct.

## <u>COUNT I</u>
### <u>First Amendment Retaliation – Cognizable Under 42 U.S.C. § 1983</u>
### (Against All Defendants)

71. Plaintiff incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

72. Plaintiff has a fundamental right to assemble and express Plaintiff's views protected by the freedom of association and freedom of speech clauses of the First Amendment, as applied to the states under the Fourteenth Amendment to the United States Constitution.

73. Defendants' actions violated Plaintiff's rights under the First Amendment to freedom of speech and freedom of assembly by interfering with Plaintiff's ability to associate freely in public and express Plaintiff's views as part of a peaceful demonstration.

74. Observing and recording public protests, and the police response to those protests, is also a legitimate means of gathering information for public dissemination that is protected by

the freedom of speech and freedom of the press clauses of the First Amendment, as applied to the states under the Fourteenth Amendment to the United States Constitution.

75.     Defendants' actions violated Plaintiff's First Amendment rights to freedom of the press and freedom of speech by interfering with Plaintiff's ability to gather information and cover a matter of public interest.

76.     Defendants engaged in these unlawful actions willfully and knowingly, acting with reckless or deliberate indifference to Plaintiff's First Amendment rights.

77.     As a direct and proximate result of Defendants' unlawful actions described herein, Plaintiff suffered damages including: physical injury, emotional trauma, great concern for Plaintiff's own safety; fear, apprehension, depression, anxiety, consternation and emotional distress;

78.     Additionally, Defendants' actions described herein have had a chilling effect on Plaintiff, who is now less likely to participate in free public discourse.

79.     At all times, Defendants were acting under color of state law.

80.     If Plaintiff prevails, Plaintiff is entitled to recover attorneys' fees, pursuant to 42 U.S.C. § 1988.

81.     Plaintiff shall donate any money she may receive to the 25-Year Managed Racial Equity Fund that the Ferguson Commission recommended as an action item for the City of St. Louis, and which, to date, the City has failed to pursue.

## <u>COUNT II</u>
### 42 U.S.C. § 1983 – First and Fourteenth Amendment Violations
### (Against Defendant Doe Police Officers)

82.     Plaintiff incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

16

83.     Plaintiff has a fundamental right to assemble and express Plaintiff's views protected by the freedom of association and freedom of speech clauses of the First Amendment, as applied to the states under the Fourteenth Amendment to the United States Constitution.

84.     Defendants' actions violated Plaintiff's rights under the First Amendment to freedom of speech and freedom of assembly by interfering with Plaintiff's ability to associate freely in public and express Plaintiff's views as part of a peaceful demonstration.

85.     Observing and recording public protests, and the police response to those protests, is also a legitimate means of gathering information for public dissemination that is protected by the freedom of speech and freedom of the press clauses of the First Amendment, as applied to the states under the Fourteenth Amendment to the United States Constitution.

86.     Defendants' actions violated Plaintiff's First Amendment rights to freedom of the press and freedom of speech by interfering with Plaintiff's ability to gather information and cover a matter of public interest.

87.     Defendants engaged in these unlawful actions willfully and knowingly, acting with reckless or deliberate indifference to Plaintiff's First Amendment rights.

88.     As a direct and proximate result of Defendants' unlawful actions described herein, Plaintiff suffered damages including: physical injury, emotional trauma, great concern for Plaintiff's own safety; fear, apprehension, depression, anxiety, consternation and emotional distress;

89.     Additionally, Defendants' actions described herein have had a chilling effect on Plaintiff, who is now less likely to participate in free public discourse.

90.     At all times, Defendants were acting under color of state law.

17

91.     If Plaintiff prevails, Plaintiff is entitled to recover attorneys' fees, pursuant to 42 U.S.C. § 1988.

92.     Plaintiff shall donate any money she may receive to the 25-Year Managed Racial Equity Fund that the Ferguson Commission recommended as an action item for the City of St. Louis, and which, to date, the City has failed to pursue.

**COUNT III**
**Unlawful Retaliation in Violation of The First Amendment**
**Cognizable Under 42 U.S.C. § 1983**
**(All Defendants)**

93.     Plaintiff incorporates by reference the allegations in the foregoing paragraphs of this Complaint as if fully set forth herein.

94.     Plaintiff was engaged in lawful First Amendment conduct of free speech and assembly.

95.     In retaliation for this exercise of Plaintiff's First Amendment rights, deployed chemical agents against Plaintiff and assaulted Plaintiff

96.     Defendants' conduct would chill a person of ordinary firmness from continuing to engage in lawful First Amendment activity of free speech and assembly.

97.     Defendants acted in retaliation against Plaintiff, and for the purpose of deterring Plaintiff from exercising Plaintiff's rights under the First Amendment to free speech and assembly.

98.     The conduct of Defendants violates the First Amendment in the United States Constitution in that Defendants deprived Plaintiff of Plaintiff's right to free speech and assembly by acting in retaliation against Plaintiff for the purpose of deterring Plaintiff from engaging in lawful protests.

99.     As a direct and proximate result of the conduct of Defendants, Plaintiff suffered injuries and damages including but not limited to: physical injury, emotional trauma, great concern

for Plaintiff's own safety; fear, apprehension, depression, anxiety, consternation and emotional distress; suppression of their First Amendment right to freedom of speech and assembly; punishment for exercising Plaintiff's First Amendment rights; and loss of faith in society.

100.    The acts of Defendants described herein were intentional, wanton, malicious, and/or were callously indifferent to the rights of Plaintiff, thus entitling Plaintiff to an award of punitive damages against Defendants.

101.    If Plaintiff prevails, Plaintiff is entitled to recover attorneys' fees, pursuant to 42 U.S.C. § 1988.

102.    Plaintiff shall donate any money she may receive to the 25-Year Managed Racial Equity Fund that the Ferguson Commission recommended as an action item for the City of St. Louis, and which, to date, the City has failed to pursue.

**COUNT IV**
**42 U.S.C. § 1983 – Conspiracy to Deprive Civil Rights**
**(Against All Defendants)**

103.    Plaintiff incorporates by reference the allegations in the foregoing paragraphs of this Complaint as if fully set forth herein.

104.    Defendants, acting in their individual capacities and under color of law, conspired together and with others, and reached a mutual understanding to undertake a course of conduct that violated Plaintiff's civil rights.

105.    In furtherance of this conspiracy, Defendants used excessive force by deploying chemical agent against Plaintiff.

106.    In furtherance of this conspiracy, Defendants assaulted Plaintiff.

107.    As a direct and proximate result of the conspiracy between Defendants and others as described above, Plaintiff was subjected to assault and the use of excessive force.

108.    As a direct and proximate result of Defendants' actions, Plaintiff suffered and will continue to suffer physical pain and injury and emotional trauma.

109.    The acts described herein were intentional and callously indifferent to the rights of Plaintiff, thus entitling Plaintiff to an award of punitive damages against the Defendants.

110.    At all times, Defendants were acting under color of state law.

111.    If Plaintiff prevails, Plaintiff is entitled to recovery attorneys' fees, pursuant to 42 U.S.C. § 1988.

112.    Plaintiff shall donate any money she may receive to the 25-Year Managed Racial Equity Fund that the Ferguson Commission recommended as an action item for the City of St. Louis, and which, to date, the City has failed to pursue.

### COUNT V
### 42 U.S.C. § 1983 – Municipal Liability
### *Monell* Claim against Defendant City of St. Louis for Failure to Train, Failure to Discipline, Failure to Supervise, and for a Custom of Conducting Unreasonable Search and Seizures and Use of Excessive Force

113.    Plaintiff incorporates by reference the allegations in the foregoing paragraphs of this Complaint as if fully set forth herein.

114.    Defendant City is liable to Plaintiff, pursuant to 42 U.S.C. § 1983, for the remaining Defendants' violation of Plaintiff's rights because the violations were caused by a policy, practice, or custom of the St. Louis Metropolitan Police Department. Among the SLMPD policies, practices, or customs that caused constitutional harm to Plaintiff are the following:

a.    SLMPD officers' routinely use excessive force when policing protests, especially those at which police brutality is being protested;

b.    SLMPD's policy or custom of issuing vague and even contradictory dispersal orders without giving an opportunity to comply;

     c.     SLMPD's policy of arbitrarily declaring unlawful assemblies in the absence of any threat or force or violent activity that provides no notice to citizens or unlawful conduct;

     d.     Additionally, SLMPD has a custom, policy, or practice of violating the Fourth Amendment by regularly conducting unreasonable seizures and arresting individuals without probable cause.

115.    Further, Defendant City has inadequately trained, supervised, and disciplined SLMPD officers, with respect to its officers' use of force.

116.    In its failures, Defendant City has been deliberately indifferent to the rights of citizens, and these failures and policies are the moving force behind, and direct and proximate cause of, the constitutional violations suffered by Plaintiff as alleged herein.

117.    As a direct result of the Defendant City's failures and policies as described herein, Plaintiff suffered damages including: physical injury, fear, apprehension, and concern for Plaintiff's own safety.

118.    If Plaintiff prevails, Plaintiff is entitled to recovery attorneys' fees pursuant to 42 U.S.C. § 1988.

119.    Plaintiff shall donate any money she may receive to the 25-Year Managed Racial Equity Fund that the Ferguson Commission recommended as an action item for the City of St. Louis, and which, to date, the City has failed to pursue.

**COUNT VI**
**Missouri State Law § 565.056 – Assault in the Fourth Degree**
**(Against Defendant Doe Police Officers)**

120.    Plaintiff incorporates by reference the allegations in the foregoing paragraphs of this Complaint as if fully set forth herein.

121.    The brandishing and deployment of chemical agents for no lawful reason by Defendants caused Plaintiff to experience apprehension of immediate physical injury.

122.    As a direct result of the conduct of Defendants described herein, Plaintiff suffered damages including: apprehension, fear, concern for Plaintiff's own safety, and physical injury.

123.    Defendant City of St. Louis obtains insurance from the Public Facilities Protection Corporation, a not-for-profit corporation into which the City pays funds yearly. The funds are later disbursed by the corporation to pay claims against the City.

124.    Alternatively, the City's relationship with the PFPC serves as a self-insurance plan. The 2017 Comprehensive Annual Financial Report for the City of St. Louis, Missouri states "[t]he PFPC is reported as if it were part of the primary government because its sole purpose is to provide the City with a defined and funded self-insurance program for claims, judgments, and other related legal matters . . .."

125.    By possessing such insurance or self-insurance, the City has waived sovereign immunity on state claims, pursuant to § 537.610.1, RSMo.

126.    The actions of Defendants as described above were carried out in bad faith and with malice, and done with actual, wanton intent to cause injury, such that punitive damages should be awarded to punish Defendants and to deter them, as well as other similarly-situated individuals, from engaging in similar conduct in the future, in an amount to be determined by a jury.

127.    Plaintiff shall donate any money she may receive to the 25-Year Managed Racial Equity Fund that the Ferguson Commission recommended as an action item for the City of St. Louis, and which, to date, the City has failed to pursue.

22

## COUNT VII
### Missouri State Law – Intentional Infliction of Emotional Distress
### (Against All Defendants)

128.    Plaintiff incorporates by reference the allegations in the foregoing paragraphs of this Complaint as if fully set forth herein.

129.    By assaulting Plaintiff and spraying Plaintiff with a chemical agent, Defendants committed acts that rose to the level of extreme or outrageous conduct that goes beyond the possible bounds of decency, so as to be regarded as atrocious and utterly intolerable in a civilized community.

130.    Defendants' actions were intentional or, at best, reckless.

131.    Such actions by Defendants have caused Plaintiff severe emotional distress that has resulted in bodily harm, as described above.

132.    Defendants' sole motivation was to cause emotional distress to Plaintiff and the other people Defendants' unlawfully arrested.

133.    As a direct result of the conduct of Defendants described herein, Plaintiff suffered damages including: physical injury, emotional trauma, great concern for Plaintiff's own safety; fear, apprehension, depression, anxiety, consternation and emotional distress; lost time; loss of employment opportunity; and loss of faith in society.

134.    Defendant City of St. Louis obtains insurance from the Public Facilities Protection Corporation, a not-for-profit corporation into which the City pays funds yearly. The funds are later disbursed by the corporation to pay claims against the City.

135.    Alternatively, the City's relationship with the PFPC serves as a self-insurance plan. The 2017 Comprehensive Annual Financial Report for the City of St. Louis, Missouri states "[t]he PFPC is reported as if it were part of the primary government because its sole purpose is to provide

the City with a defined and funded self-insurance program for claims, judgments, and other related legal matters . . ..”

136.    By possessing such insurance or self-insurance, the City has waived sovereign immunity on state claims pursuant to § 537.610.1, RSMo.

137.    The actions of Defendants as described above were carried out in bad faith and with malice, and done with actual, wanton intent to cause injury, such that punitive damages should be awarded to punish Defendants and to deter them, as well as other similarly-situated individuals, from engaging in similar conduct in the future, in an amount to be determined by a jury.

138.    Plaintiff shall donate any money she may receive to the 25-Year Managed Racial Equity Fund that the Ferguson Commission recommended as an action item for the City of St. Louis, and which, to date, the City has failed to pursue.

## COUNT VIII
### Missouri State Law – Negligent Infliction of Emotional Distress
### (Against All Defendants)

139.    Plaintiff incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

140.    Alternative to Count VII, above, by assaulting Plaintiff and spraying Plaintiff with tear gas, Defendants realized or should have realized that their conduct posed an unreasonable risk to Plaintiff.

141.    Further, Plaintiff was reasonably in fear for Plaintiff's own person because of the actions of Defendants and suffered emotional distress or mental injury that is medically diagnosable and sufficiently severe to be medically significant as a result of Defendants' actions.

142.    Defendant City of St. Louis obtains insurance from the Public Facilities Protection Corporation, a not-for-profit corporation into which the City pays funds yearly. The funds are later disbursed by the corporation to pay claims against the City.

143.    Alternatively, the City's relationship with the PFPC serves as a self-insurance plan. The 2017 Comprehensive Annual Financial Report for the City of St. Louis, Missouri states "[t]he PFPC is reported as if it were part of the primary government because its sole purpose is to provide the City with a defined and funded self-insurance program for claims, judgments, and other related legal matters . . .."

144.    By possessing such insurance or self-insurance, the City has waived sovereign immunity on state claims, pursuant to § 537.610.1, RSMo.

145.    The actions of Defendants as described above were carried out in bad faith and with malice, and done with actual, wanton intent to cause injury, such that punitive damages should be awarded to punish Defendants and to deter him or her, as well as other similarly-situated individuals, from engaging in similar conduct in the future, in an amount to be determined by a jury.

146.    Plaintiff shall donate any money she may receive to the 25-Year Managed Racial Equity Fund that the Ferguson Commission recommended as an action item for the City of St. Louis, and which, to date, the City has failed to pursue.

### COUNT IX
### 42 U.S.C. § 1983 – Fourth and Fourteenth Amendment: Excessive Force
### (Against Defendant Doe Police Officers)

147.    Plaintiff incorporates by reference the allegations in the foregoing paragraphs of this Complaint as if fully set forth herein.

148.    Defendants engaged in these actions willfully and knowingly, acting with reckless or deliberate indifference to the Plaintiff's Fourth Amendment rights. As a direct and proximate result of Defendants' unlawful actions, Plaintiff was damaged.

149.    The use of force against Plaintiff, by punitively assaulting Plaintiff with tear gas, was objectively unreasonable and constituted excessive force.

150.    As a direct result of the conduct of Defendants described herein, Plaintiff suffered physical injury and emotional trauma.

151.    At all times, Defendants were acting under color of state law.

152.    If Plaintiff prevails, Plaintiff is entitled to recover attorneys' fees, pursuant to 42 U.S.C. § 1988.

153.    Plaintiff shall donate any money she may receive to the 25-Year Managed Racial Equity Fund that the Ferguson Commission recommended as an action item for the City of St. Louis, and which, to date, the City has failed to pursue.

### COUNT X
### Missouri State Law – Battery
### (Against Defendant Doe Police Officer)

154.    Plaintiff incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

155.    During the process of being unconstitutionally tear gassed, Plaintiff suffered battery at the hands of Defendants.

156.    In spraying Plaintiff with tear gas caused further intentional and offensive bodily contact.

157.    Namely, Defendants' physically aggressive tactics caused intentional and offensive bodily harm to Plaintiff.

158.     As a direct result of Defendants' conduct described herein, Plaintiff suffered damages including: physical injury, emotional trauma, great concern for Plaintiff's own safety; fear, apprehension, depression, anxiety, consternation and emotional distress.

159.     Defendant City of St. Louis obtains insurance from the Public Facilities Protection Corporation, a not-for-profit corporation into which the City pays funds yearly. The funds are later disbursed by the corporation to pay claims against the City.

160.     Alternatively, the City's relationship with the PFPC serves as a self-insurance plan. The 2017 Comprehensive Annual Financial Report for the City of St. Louis, Missouri states "[t]he PFPC is reported as if it were part of the primary government because its sole purpose is to provide the City with a defined and funded self-insurance program for claims, judgments, and other related legal matters . . ."

161.     By possessing such insurance or self-insurance, the City has waived sovereign immunity on state claims, pursuant to § 537.610.1, RSMo.

162.     The actions of Defendants as described above were carried out in bad faith and with malice, and done with actual, wanton intent to cause injury, such that punitive damages should be awarded to punish Defendants and to deter them, as well as other similarly-situated individuals, from engaging in similar conduct in the future, in an amount to be determined by a jury.

163.     The Plaintiff shall donate any money she may receive to the 25-Year Managed Racial Equity Fund that the Ferguson Commission recommended as an action item for the City of St. Louis, and which, to date, the City has failed to pursue.

**WHEREFORE**, Plaintiff prays for judgment in favor against all Defendants for compensatory damages, punitive damages, attorneys' fees, expenses, costs, and for any other relief this Court deems just and appropriate.

Date: September 25, 2018                    Respectfully Submitted,

**KHAZAELI WYRSCH LLC**

/s/ James R. Wyrsch
James R. Wyrsch, MO53197
Javad Khazaeli, MO 53735
Kiara Drake, MO 67129
911 Washington Avenue, Suite 211
St. Louis, MO 63101
(314) 288-0777
(314) 400-7701 (fax)
james.wyrsch@kwlawstl.com
javad.khazaeli@kwlawstl.com
kiara.drake@kwlawstl.com